**United States District Court**
**District of Massachusetts**

```
                                )
RFF FAMILY PARTNERSHIP, LP,     )
          Plaintiff,            )
                                )
     v.                         )  Civil No.
                                )  11-10968-NMG
LINK DEVELOPMENT, LLC, JEFFREY  )
KARLL, RUSSELL AND ASSOCIATES,  )
LLC and STEVEN A. ROSS, in his  )
capacity as Trustee of BD Lending )
Trust,                          )
          Defendants.           )
                                )
```

**MEMORANDUM & ORDER**

**GORTON, J.**

This action involves a series of disputes with respect to loan obligations and the associated mortgages encumbering 22 acres of commercial land in Saugus, Massachusetts ("the Property").

**I.  Facts**

The Court assumes the parties' familiarity with the factual background to this case and will review below only the two incidents placed in issue by the parties' motions for summary judgment.

**A.  BD Lending's 2006 Loan to Link**

During September 2006, Attorney Stuart Sojcher contacted his friend and fellow attorney Steven Ross to request a short-term

-1-

loan, purportedly on behalf of Link Development, LLC ("Link"),
although Sojcher intended to use at least a portion of the
proceeds to pay off unrelated debts.  Ross represented investors
interested in asset-based loan financing (also called "hard money
lending") and the loan sought by Sojcher was to be secured by a
mortgage on the Property.

Throughout the discussions Sojcher represented,
unequivocally, that he had authority to act on behalf of Link.
Sojcher had previously filed Link's Certificate of Organization
in August 2005, purportedly at the behest of Adel Fadili
("Fadili").  Fadili originally instructed Sojcher to purchase the
Property at a foreclosure sale using funds that Fadili's brother,
Essam al Tamimi ("Tamimi"), had transferred directly into
Sojcher's client funds account.  The Certificate that Sojcher
filed, however, indicated that Link's sole member and manager was
Tamimi rather than Fadili or Sojcher himself.

After speaking with Sojcher, Ross contacted his client,
Robert A. Wallace, to discuss the possibility of funding the loan
to Sojcher.  Ross and Wallace agreed to make a 60-day loan in the
amount of $600,000 in exchange for a lien on the Property ("the
BD Loan").  On September 29, 2006 Ross formed BD Lending Trust
("BD Lending") for that purpose, naming Wallace as its trustee.[1]

---

[1] The Complaint originally named Wallace as a defendant in
his capacity as trustee of BD Lending, but he was dismissed from
the case on July 31, 2012 after Ross replaced him as trustee.

-2-

On the same day, and apparently at Ross's behest, Sojcher filed several documents with the Commonwealth of Massachusetts purportedly establishing that Sojcher was a "member" of Link and consenting to the loan on Link's behalf. None of those documents bore Tamimi's signature.

Jeffrey Karll, Link's current manager and principal representative in this suit, became aware of Sojcher's loan on October 2, 2006, after he learned that Sojcher had been "peddling" the Property. He contacted Wallace and disputed Sojcher's authority to negotiate the BD Loan. BD Lending disputes the significance of that contact because Karll was not, at the time, Link's manager nor did his name appear on Link's incorporating documents. Further, defendants claim Karll's call was suspicious because he refused to reveal who he worked for and who actually owned the Property.

After Sojcher learned of Karll's objection, he consulted with Fadili. Even though Fadili did not authorize Sojcher to consummate the loan, BD Lending claims that Fadili instructed Sojcher to ignore Karll's objections and thereby authorized the loan himself.

BD Lending later agreed, at Sojcher's urging, to lend an additional $100,000. When Link failed to repay the loan, BD Lending foreclosed upon the Property in November 2006, an action that was litigated by Link in state court.

-3-

**B.    RFF's 2007 Loan to Link, the Purported Oral Forbearance Agreement and 2010 Foreclosure**

In October, 2007, RFF Family Partnership, LP ("RFF" or "plaintiff"), a private money lender managed by principal Robert Freedman, loaned $1.4 million to Link ("the RFF Loan"), secured by a mortgage on the Property ("the RFF mortgage").    In connection with the subject loan, the parties executed a loan agreement, a promissory note, a mortgage, a security agreement, an assignment of rents and a subordination agreement (collectively, "the subject loan agreements").

Link's obligation to repay the loan came due in March 2008. It did not make a payment at that time but entered into negotiations with RFF to avoid default.    Karll, then Link's manager, believed that the parties reached an oral forbearance agreement in June 2008, pursuant to which 1) Link agreed to share with RFF 10% of the profits from development of the Property and 2) $180,000 of the original loan proceeds placed in escrow were to be repaid to RFF.    RFF's 10% stake was to be accomplished by the formation of a limited liability company known as Saugus Realty Rescue LLC ("the Rescue LLC").

The parties dispute whether an oral forbearance agreement was ever reached.    Mr. Karll concedes that he negotiated the purported agreement with RFF through Attorney Frank Kirby, whom Karll claims was acting as RFF's agent.    The negotiations occurred by phone from Kirby's office.    Karll spoke to Kirby, who

-4-

was on the phone with Freedman.  Although Karll never spoke
directly to Freedman, he assumed that Freedman agreed to the
forbearance based on what he heard Kirby telling him.

Karll knew that Kirby had helped RFF arrange three
commercial loans in Massachusetts.  One of those loans was the
subject loan with respect to which Link had paid Kirby $34,000 in
legal fees.  Kirby also purportedly received a substantial amount
of the loan proceeds, which RFF now characterizes as his
brokerage fee paid by Link.

The record indicates that the Rescue LLC was established
subsequent to the loan negotiations.  Karll and Kirby executed
documents forming the Rescue LLC and establishing its 10%
interest in the Property on June 3, 2008.  Unbeknownst to Karll,
Kirby had already executed an operating agreement for the Rescue
LLC with RFF's principal, Robert Freedman, the previous day.
Kirby signed that operating agreement as the manager of the
Rescue LLC.

Whether Link ever remitted to RFF $180,000 of the proceeds
from the RFF Loan is less certain.  A few days after the Rescue
LLC was formed, Kirby approached Karll and asked him to record a
mortgage on the Property in favor of RFF in the amount of
$150,000.  Doing so would have purportedly satisfied Link's
remaining obligation under the forbearance agreement but Karll
refused, stating that he would not record a mortgage until RFF

-5-

executed a written "standstill agreement" on its loan.

Link did not execute any other agreements with respect to the proposed forbearance with either RFF or Mr. Kirby. Karll had regular interactions with RFF, through Mr. Freedman, during which Karll updated him on Karll's efforts to develop and sell the Property. Karll never confirmed the existence of a forbearance agreement during that time nor did Freedman express his intention to foreclose upon the property.

In March 2010, RFF foreclosed on the Saugus property and purchased it at the foreclosure sale for $2.5 million.

## II. **Procedural History**

RFF filed a Complaint against Link, Karll, the Trustee of BD Lending and Russell Associates (collectively "defendants") on June 1, 2011. The Complaint alleges that Link and Karll 1) defaulted on the loan, 2) breached the loan agreements and 3) falsely represented that RFF had a legally valid and enforceable first lien on four parcels of land in Saugus, Massachusetts (the Property). The Complaint also alleges that the BD Lending mortgage is a fraudulent mortgage that must be discharged. RFF has since foreclosed on the Property but seeks to recover a deficiency of approximately $300,000.

The Court entered a preliminary injunction in July 2011, enjoining the defendants from transferring or distributing "any interest in or proceeds derived from" two related actions filed

-6-

in Massachusetts Superior Court and the Massachusetts Land Court.

On July 14, 2011, Link filed counterclaims against RFF asserting that, by foreclosing, RFF breached the purported oral forbearance agreement described above. The counterclaims are for breach of contract, breach of implied covenant of good faith, promissory estoppel, wrongful foreclosure, breach of fiduciary duty, misrepresentation and unfair and deceptive practices in violation of M.G.L. ch. 93A.

On March 12, 2012, this Court entered an order denying RFF's motion to dismiss Link's counterclaims and denying the motion of BD Lending and Russell Associates to dismiss the count in RFF's Complaint seeking a declaratory judgment invaliding their liens on the Property. The Court also allowed Link's motion for a lis pendens on the Property based upon its claim of wrongful foreclosure.

Link now moves for summary judgment on Count V of RFF's complaint which sounds in breach of contract based upon Link's alleged default on the loan. RFF moves for summary judgment on all of Link's counterclaims arising from the alleged oral forbearance agreement and on BD Lending's mortgage on the property.

## III. **Motions for Summary Judgment**

### A.    **Standard**

The role of summary judgment is "to pierce the

-7-

pleadings and to assess the proof in order to see whether there is a genuine need for trial." Johnson v. Gordon, 409 F.3d 12, 16-17 (1st Cir. 2005)(quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." Id. A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The Court must view the entire record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. Johnson, 409 F.3d at 17. Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists

-8-

and that the moving party is entitled to judgment as a matter of
law.

## B.   Defendant's Motion for Partial Summary Judgment

Link moves for summary judgment on Count V of RFF's
complaint.  Count V states a claim for breach of contract based
upon Link's alleged default.  Link concedes that it defaulted but
claims that RFF has been satisfied as a result of the foreclosure
sale of the Property for $2.5 million.  Moreover, Link claims
that the sale resulted in a surplus over the amount it owed and
therefore seeks judgment in its favor in the amount of $500,000.

In its claim for a deficiency, RFF argues that it was owed
approximately $2.76 million on the RFF Loan, including the
principal, compound interest and costs associated with
foreclosure on the property.  RFF now concedes that the note did
not provide for compound interest.  Massachusetts law defaults to
the application of simple interest. See Berman v. B.C.
Associates, Inc., 219 F.3d 48, 50-51 (1st Cir. 2000).
Consequently, the maximum amount that Link owes on its loan,
inclusive of costs and interest at the allegedly usurious rate of
32%, is $2.42 million.  Because that maximum is less than the
$2.5 million purchase price, RFF's claim for a deficiency fails
as a matter of law.

RFF claims it is still entitled to a deficiency judgment
under Count V based upon the broad language of M.G.L.c. 183 § 27,

-9-

governing proceeds of foreclosure, which entitles the foreclosing party to "retain all sums then secured by the mortgage."  This clause, RFF contends, permits it to recover based upon Link's alleged misrepresentations and its breaches of the loan agreement, which also comprise the grounds for Counts III, IV and VI of the Complaint.  RFF cites no authority supporting its contention and the Court sees no reason to adopt such an expansive meaning of that statute, particularly when the factual issues surrounding Link's alleged breaches must still be adjudicated.

Similarly, the Court concludes that there remain genuine issues of material fact with respect to 1) the exact amount Link owed on the RFF Loan, 2) whether RFF owes a surplus to Link, 3) RFF's costs at the foreclosure and 4) whether RFF satisfied the notice requirements regarding the Massachusetts usury law (a question assumed but not decided for purposes of this motion).

The Court will not, however, dissolve the preliminary injunction entered on July 8, 2011 that currently restrains Link from transferring any assets derived from settlements in related state court actions.  The proceeds from those settlements are apparently Link's only remaining assets. See Teradyne, Inc. v. Mostek Corp., 797 F.2d 43, 52 (1st Cir. 1986) (preliminary injunction is appropriate where defendant likely to be insolvent at time of judgment).

Accordingly, Link's motion for summary judgment on Count V will be allowed but its counterclaim for a surplus judgment and dissolution of the preliminary injunction will be denied.

## C. Plaintiff's Motion for Partial Summary Judgment

### 1. Declaratory Judgment on BD's Mortgage

RFF argues that the undisputed facts now require the Court to declare BD Lending's mortgage on the Property invalid because Sojcher lacked authority to bind Link to a mortgage. BD Lending disputes that claim and counters that, at a minimum, it reasonably believed that Sojcher had apparent authority to act on behalf of Link or, in the alternative, that Link ratified his actions.

An agency relationship is created when there is mutual consent, express or implied, that the agent is authorized to act on behalf and for the benefit of the principal, subject to the principal's control. Theos & Sons, Inc. v. Mack Trucks, Inc., 729 N.E.2d 1113, 1119 (Mass. 2000). A principal may also be held vicariously liable for a third party's reliance on a purported agent's unauthorized actions under the apparent authority doctrine, provided that the third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations. Smith v. Jenkins, 718 F. Supp. 2d 155, 165 (D. Mass. 2010). It is the conduct of the principal, not the agent, that creates apparent

-11-

authority. Id. (citing Sheinkopf v. Stone, 927 F.2d 1259, 1269 (1st Cir. 1991)).   Nonetheless, under Massachusetts law, proof of agency, actual or apparent, is normally a question for the finder of fact. White's Farm Dairy, Inc. v. De Laval Separator Co., 433 F.2d 63, 66 (1st Cir. 1970).

Finally, where an agent lacks actual authority to agree on behalf of the principal, the principal may still be bound if he acquiesces to the agent's action or fails to disavow it promptly. Linkage Corp v. Trustees of Boston Univ., 679 N.E.2d 191, 204 (Mass. 1997).

Sojcher never owned the Property nor was he an owner of Link.   His attempts to assume legal authority to execute the BD Loan are unavailing because only Tamimi could have amended the Certificate to permit him to file those documents and none of those filings bore Tamimi's signature. See M.G.L.c. 156C § 15 (amendments may be made by "any manager" or "any other authorized person set forth in the certificate of organization").

BD Lending asks the Court to find that Sojcher had actual authority based upon his representations, the fact that he filed the Certificate of Organization and that he signed it as an "authorized person."   The first argument is contrary to the law of agency and the second is unreasonable because the Certificate of Organization clearly identifies Tamimi as the only person authorized to execute documents on Link's behalf or to file

-12-

amendments to its certificate.

In order for Link (and RFF) to be bound by Sojcher's representations to BD Lending, Sojcher must have either acted with the actual or apparent authorization (or subsequent ratification) of a principal of Link. Tamimi, Link's sole member at the time, could have authorized Sojcher's actions but the parties never consulted him. Fadili, Tamimi's brother and de facto owner of the Property, could have authorized Sojcher's loan but the record reveals that Fadili had no knowledge of the loan at the time it was executed.

There is, however, at least a genuine issue of material fact as to whether Fadili ratified the BD Loan during his October 2006 communications with Sojcher, such that Link (and ultimately RFF) may still be bound by the agreement.[2] While Karll purported to act on Link's behalf when he told BD Lending that the loan negotiated by Sojcher was unauthorized, Karll was not a member of Link at that time. Sojcher apparently relied upon Fadili's instructions and acted on Link's behalf again on October 18, 2006 to ratify the amendment to increase the existing loan by $100,000. Those communications suggest that Fadili, at least, had the opportunity to contact BD Lending to disavow Sojcher's

_____

[2] BD Lending apparently argues that RFF is foreclosed from challenging its claim to the Property because Link waived its right to challenge BD Lending's claim in its settlement of a related state court lawsuit. BD Lending does not explain, however, how Link's actions could extinguish RFF's rights.

-13-

actions.

Accordingly, while Sojcher lacked actual or apparent authority to execute the initial BD Loan, summary judgment on Count I is unwarranted because Sojcher's actions may have been subsequently ratified.

### 2. Link's Counterclaims

In support of RFF's motion for summary judgment on Link's counterclaims against it, RFF contends that Link lacks standing to assert its counterclaims and, in the alternative, has no basis for asserting counterclaims because the oral forebearance agreement upon which it relies is not legally enforceable.

#### a. Standing

RFF contends that, by virtue of Karll's assignment of his interest in Link to the Hiland Realty Trust, Link is no longer a real party in interest under Fed. R. Civ. P. 17(a) and lost standing to pursue its counterclaims against RFF relating to its foreclosure on the Saugus property. The Court disagrees. While Mr. Karll assigned his interest in Link to the Hiland Trust Realty, which is not a party to this suit, Link executed the mortgages relevant to this suit and is the entity interested in the foreclosed Saugus property. That Hiland stands to benefit from Link's claims does not prevent Link from asserting them.

#### b. Existence of a Forbearance Agreement

RFF next asserts that it is entitled to summary judgment on

-14-

Link's counterclaims because it never agreed to the proposed forbearance and, even if it had, the loan could not be orally modified. Link responds that Karll's reliance and the existence of Saugus Realty Rescue is evidence of an oral agreement, and further, that such agreement is enforceable as an agreement to form a partnership or a joint venture, or as an oral modification to a mortgage.

The Court begins by determining whether the kind of agreement Link seeks to enforce may be agreed to orally. While the Statute of Frauds prohibits oral contracts for the sale of land, or interests in the sale of land, oral agreements that alter the method by which a mortgage is paid off but do not affect the "right, title and interest" in the security are enforceable. Mack v. Wells Fargo Bank, N.A., 2011 WL 4837261, at *6 (Mass. Super. 2011) (citing Siegel v. Knott, 55 N.E.2d 889, 890-91 (Mass. 1944)). Such modifications include the amount of the payments and the length of time over which they may be made. See id. (citing Massachusetts case law).

Here, Link alleges that under the oral forbearance agreement RFF was to forbear from collecting interest or foreclosing upon the 2007 loan to Link in exchange for 10% of the profits derived from the sale or development of the Property and the remission of $180,000 of the proceeds from the original loan. If provable, such an agreement modifies the repayment schedule on the subject

-15-

loan and thus could be made orally.

Whether such an agreement actually was made is a closer question. The first term of the purported agreement appears to have been met. Documentary evidence shows that Karll and Kirby formed the Rescue LLC on June 3, 2008, with Kirby as its manager and, unbeknownst to Karll, with Freedman as a participant. There is no evidence that the Rescue LLC was later dissolved or modified and it purportedly held a 10% security interest in the Property.

Whether the second term of the agreement was ever met is a mystery. Karll admits that he never found out whether Kirby, who had control over the original escrowed loan proceeds, ever remitted $180,000 to RFF. Further, it is undisputed that Karll 1) refused to record a $150,000 mortgage on the Property, purportedly to satisfy the second term of the forberance, and 2) he stated he would not record any mortgage "until I see the standstill agreement and the operating agreement."

RFF contends that those actions constituted Karll's rejection of their counter-offer or are, at least, evidence of his awareness that there was no agreement. Link maintains that Karll reasonably believed RFF had orally committed to forbear in light of 1) the formation of Saugus Realty Rescue, 2) RFF's actual forbearance for more than 18 months, 3) Karll's efforts to sell or develop the Property purportedly in reliance on the

-16-

forbearance agreement and 4) the fact that Karll regularly spoke with Freedman to update him on the status of those efforts without ever hearing Freedman mention any intention to foreclose.

A third obstacle to enforcement of the alleged forbearance agreement is the question of whether Kirby had authority to bind RFF during the process.  Karll acknowledges that he did not deal with Freedman directly while negotiating the forbearance agreement.  Rather, he "assumed" that Freedman had agreed based upon Karll's negotiations with Mr. Kirby whom Karll allegedly believed to be acting as Freedman's agent.

The evidence of Kirby's agency is, at best, ambiguous, such that the Court cannot conclude as a matter of law who Kirby represented.  RFF claims it never employed Kirby and Link concedes that it had paid Kirby for legal services related to the RFF Loan.  While Kirby had brokered two other deals for RFF in Massachusetts, his role in negotation of the loan to Link was merely to accompany Karll to California where he introduced him to Freedman before those two reached an agreement.  That would suggest that Kirby was acting as a broker or perhaps Link's agent rather than as RFF's agent.

Nevertheless, Kirby allegedly relayed to Karll Freedman's position on the purported forbearance in June 2008.  Kirby managed the Rescue LLC that owned RFF's 10% interest and Kirby approached Karll with the $150,000 mortgage in RFF's favor.  Most

-17-

important, Freedman's subsequent conduct did not disavow Kirby's actions. Karll claims that he had regular contact with Freedman after those negotiations and that Freedman never mentioned foreclosure or the standstill agreement while he continued to update Freedman on his effort to sell or develop the Property. Karll claims he made that effort in reliance on the forberance.

In sum, Link must persuade the triers of fact to accept several contested inferences before they can find in favor of Link on its counterclaims. While the Court is skeptical that the jury will do so, it is mindful that both questions of agency and state of mind are reserved for the finder of fact. See White's Farm Dairy, 433 F.2d at 66 (agency questions); Hahn v. Sargent, 523 F.2d 461, 468 (1st Cir. 1975) (noting courts should be circumspect to grant summary judgment on issues involving state of mind if non-moving party can produce the quantum of evidence needed to reach the jury). For that reason, and assuming the facts in the light most favorable to Link, RFF has not carried its burden on summary judgment and its motion will be denied.

### c.   Breach of Fiduciary Duty

RFF further argues that Link's counterclaim based upon breach of fiduciary duty and Chapter 93A must still be dismissed. Under Massachusetts law, the relationship between a lender and a borrower, without more, does not establish a fiduciary relationship. Famm Steel, Inc. v. Sovereign Bank, 571 F.3d 93,

-18-

102 (1st Cir. 2009). If the borrower reposes trust and
confidence in the lender and the lender knows and accepts the
borrowers' trust, however, that transaction may involve a
fiduciary relationship. Id. Alternatively, if the alleged oral
forbearance agreement formed a joint venture, partners in a joint
venture owe one another the same fiduciary duties imposed upon
members of a partnership. Shain Inv. Co. v. Cohen, 443 N.E.2d
126, 131 (Mass. App. Ct. 1982).

The Court is again skeptical that the facts here demonstrate
the parties' intent to enter into a joint venture, let alone a
partnership. Massachusetts courts examine as many as eight
factors when determining whether an agreement constitutes a joint
venture but an essential element is mutual control or management
of the enterprise. Shain, 443 N.E.2d at 130. Link has not
adduced specific facts suggesting that, as part of the
forbearance agreement, RFF would have greater control over how
the Property would be developed. Further, the agreement did not
purport to extend to RFF an equal share in the profits or losses,
another key factor in making such a determination. See id.

Viewing the facts in the light most favorable to the non-
movant, however, it is possible that Karll's continued contact
with Freedman, if proven, established a relationship of trust and
confidence between Karll and Freedman which was perpetuated
through their continued conversations. Accordingly, a genuine

-19-

issue of material fact exists as to whether RFF owed Link a
fiduciary duty.

Finally, because the Court has denied summary judgment to
RFF on Link's other counterclaims, it remains possible, although
tenuous, that Link may convince the Court that it is entitled to
relief under Chapter 93A.  RFF's motion for summary judgment on
the 93A claim will therefore be denied.

## IV.  **Plaintiff's Motion for Contempt**

Plaintiff moves the Court to hold Link in contempt of a
prior order of the magistrate judge requiring Link to produce
Tamimi for a telephonic deposition.  Tamimi purportedly co-
managed Link with Karll at a time relevant to the litigation.
Apart from urging the Court again to order the production of
Tamimi, plaintiff also requests as a remedy dismissal of Link's
counterclaims and fees and costs for contesting this motion.

Link replies that Tamimi currently resides in the United
Arab Emirates and is no longer employed by Link, therefore
rendering him outside of Link's control.  Further, Tamimi
purportedly played no role in creating the contested mortgage
with BD Lending and Karll has been deposed on that topic, so RFF
is not prejudiced as a result.  Finally, because the magistrate
judge's order simply permitted plaintiff to contact Tamimi but
did not order Link to produce him, no sanction is warranted.

-20-

The Court declines to hold Link in contempt because Tamimi refuses to appear for a deposition.  The Court is persuaded by Link's representations that Tamimi does not have knowledge of the transaction at issue which Karll himself lacks.  Accordingly, plaintiff's motion will be denied.  Link will not, of course, be permitted to introduce testimony from Tamimi on the company's behalf.

### ORDER

In accordance with the foregoing,

1)   Defendant Link's motion for partial summary judgment (Docket No. 56) on Count V of the Complaint is **ALLOWED,** but its requests for dissolution of the Court's injunction and a finding of a surplus are **DENIED;**

2)   Plaintiff RFF's motion for partial summary judgment (Docket No. 60) is **DENIED;** and

3)   Plaintiff's motion for contempt (Docket No. 45) is **DENIED.**

**So ordered.**

Nathaniel M. Gorton
United States District Judge

Dated November 5 , 2012