**United States District Court
District of Massachusetts**

```
_____
                                )
RFF FAMILY PARTNERSHIP, LP,      )
          Plaintiff,             )
                                )
        v.                       )      Civil No.
                                )      11-10968-NMG
LINK DEVELOPMENT, LLC, and       )
JEFFREY KARLL,                   )
          Defendants.            )
_____ )
```

**MEMORANDUM OF DECISION**

**GORTON, J.**

This case involves a series of disputes with respect to loan obligations and associated mortgages encumbering 22 acres of commercial land in Saugus, Massachusetts. The plaintiff-lender foreclosed upon a mortgage it held on the property and bought the property at auction.

Plaintiff now sues the defendant-borrower for breach of contract, specific performance, injunctive relief and indemnification and it claims damages on account of several actions taken by the borrower that occurred prior to the foreclosure sale. Defendant-borrower responds by counterclaiming for reimbursement of the alleged surplus from the foreclosure sale and for breach of the covenants of good faith and fair dealing, wrongful foreclosure and unfair business practices.

This Court, sitting without a jury, presided over a three-

day trial of this case in mid-November, 2012.  The Court now publishes its findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

**Findings of Fact**

    **A.    Parties**

    1.  RFF Family Partnership, LP ("RFF") is a California limited partnership and private money lender.  RFF, Inc. is the general partner of RFF.

    2.  Robert Freedman ("Freedman") owns and operates RFF, Inc. At all relevant times, Freedman was authorized to act on behalf of RFF.

    3.  Link Development, LLC ("Link") is a Massachusetts limited liability company.

    4.  Jeffrey Karll ("Karll") represented himself as the manager of Link.  At various times, Karll also represented himself as the Manager of Desert Pine LLC ("Desert Pine"), a creditor of Link.[1]

    **B.    The Property**

    5.  The property at issue in this case is 22 acres of undeveloped real property abutting Route 1 at 1-12 Denise Drive

---

[1] The documentation pertaining to the authenticity of the mortgages on the Property is woefully deficient.  For example, Karll filed an "Amended and Restated Certificate of Organization" granting himself the authority to act as Link's Manager and signed that certificate on behalf of Link.  Because such unorthodox practices were not contested at trial, the Court will presume that Karll had authority to so act.

and Sanders Drive in Saugus, Massachusetts, comprised of three
unregistered parcels and one registered parcel of land ("the
Property").

6.  On August 2, 2005, Link took title to the Property by
foreclosure deed.

**C.   Prior Encumbrances on the Property**

7.  On August 20, 2005, Attorney Stuart Sojcher ("Sojcher")
purportedly acting on behalf of Link, signed a mortgage in the
original principal amount of $2 million granting Desert Pine LLC
a security interest in the Property ("the Desert Pine Mortgage").

8.  On September 29, 2006, Attorney Sojcher, again
purportedly acting on behalf of Link, signed a 30-day promissory
note payable to BD Lending Trust ("BD Lending") in the original
principal amount of $600,000 (later increased to $700,000).  The
note was secured by a second mortgage on the Property, this one
in favor of BD Lending ("the BD Lending Mortgage"), that Attorney
Sojcher had recorded.

9.  After Link's default under the short-term loan, BD
Lending commenced foreclosure proceedings on the Property in or
about November, 2006.

10.  In or about December, 2006, Link filed verified
complaints contesting the BD Lending Mortgage and foreclosure
proceeding in Massachusetts Land Court and in Massachusetts
Superior Court for Suffolk County (collectively, "the State Court

Actions"). At various times, Link was represented by the law firm Russell & Associates LLC ("Russell") in the State Court Actions.

11. In June, 2012 Link and BD Lending reached a negotiated settlement in the State Court Actions. In exchange for a substantial monetary payment, Link acknowledged that BD Lending intended to continue to seek to enforce its mortgage on the Property and Link waived its rights to contest the authenticity of the BD Lending Note and Mortgage.

### D. RFF's Advance and Due Diligence prior to Loan Transaction

12. Karll, acting on behalf of Link, met with Freedman in California to seek a short-term loan from RFF in April, 2007.

13. On April 4, 2007, Link signed a promissory note in the original principal amount of $210,000, to mature in September, 2007, payable to RFF. That note was secured by a mortgage on the Property. Karll also signed the April, 2007, note individually as a guarantor for Link. The parties intended the April, 2007 note to be an advance on a $1.4 million loan from RFF to Link.

14. RFF retained Burns & Levinson, LLP ("Burns & Levinson") to represent it as counsel with respect to the negotiation of the larger loan transaction.

15. During the summer 2007, Burns & Levinson conducted due diligence with respect to the prospective loan on behalf of RFF. As part of that due diligence, Burns & Levinson discovered the

allegedly fraudulent BD Lending Mortgage on the Property and learned that Link viewed the BD Lending mortgage as "bogus" and that Karll claimed to have told Freedman that Link was not obligated to pay it and would not pay it.

16.   By letter dated August 27, 2007, Burns & Levinson sought a title insurance commitment from Old Republic National Title Insurance Company ("Old Republic").  That letter included a report prepared by Burns & Levinson that discussed, among other issues, the status of the BD Lending mortgage that Karll sought to discharge.  Freedman was copied on the letter.

17.   On September 17, 2007 and October 10, 2007, RFF filed notices pursuant to M.G.L. c. 271, § 49 with the Massachusetts Attorney General's office ("the Usury Notices").

18.   Both Usury Notices stated that "[i]nterest and other charges [are] not expected to, but may" exceed 20% per year and that RFF would maintain records as required by M.G.L.c. 271, § 49 and make them available to the Attorney General upon request. Both Notices were signed by Robert Freedman.

### E.   Closing of the $1.4 million Loan

19.   On October 15, 2007, Link and RFF executed documents to reflect a $1.4 million loan from RFF to Link ("the Loan Transaction").  Attorney Michael MacClary ("Attorney MacClary") represented RFF and Attorney George Gregson ("Attorney Gregson") represented Link.

20.  With respect to the Loan Transaction, Karll, on behalf of Link, signed, among other documents, a loan agreement ("the Loan Agreement"), a promissory note in the original principal amount of $1.4 million ("the Note") and a mortgage granting RFF a security interest in the Property ("the Mortgage") (collectively, the "Loan Documents").  In addition, Karll individually signed a Guaranty.

21.  The Note provided for an extension of the maturity date of the Loan for an additional six months, from March 15, 2008 until October 15, 2008, upon 30 days prior written notice by Link and the prepayment of interest in the amount of $105,000.

22.  The failure of Link to pay interest on the loan when and as it became due was to constitute "a payment default" under the Note in which case:

> the amount due and unpaid shall bear interest at the lesser of the highest annual rate which may lawfully be charged and collected under applicable law on the obligation evidenced by this Note or an annual rate which shall be five percent (5%) higher than the Interest Rate plus one percent (1%) per month (the 'Agreed Rate'), computed from the date on which the amount was due and payable until paid.

23.  In addition to a payment default, an "Event of Default" occurred under the Note whenever Link failed to perform any obligation required by the Loan Documents that was "not cured within the stated cure period" or "within thirty (30) days" of the default.

24.  Upon the occurrence of an Event of Default, Link

promised to "pay all reasonable costs of enforcement [of the Note] and collection" which was to include "court costs and reasonable attorneys' fees."

25.   The Note explicitly states that it was the intent of the parties that the "loan evidenced hereby be exempt from the restrictions of the usury laws."

26.   By execution of the Mortgage, Link represented that, inter alia: a) there were "no actions, suits or proceedings pending" involving the "enforceability" of the Mortgage and that the Property was "free from all liens and encumbrances [and] security interests"; b) Link would "indemnify, defend and hold harmless" RFF with respect to demands made upon the Property by such lienholders; c) Link would not "grant[] or suffer[] any liens, encumbrances or security interests" other than "Permitted Encumbrances"; and d) Link would pay all taxes and municipal assessments applicable to the Property ten days before they became due.

27.   By execution of the Loan Agreement, Link represented that, inter alia: a) the Mortgage would be a "good first mortgage" and "not ... subject to any liens or encumbrances, whether inferior or superior"; b) Link would not incur, assume, create or permit "any mortgage, pledge, lien, lease, encumbrance or charge" on the Property without the prior written consent of RFF; c) Link would "pay all real and personal property taxes" in

-7-

such a manner as to prevent any penalty from accruing; d) the obligations contained in the Loan Documents would continue "until the Indebtedness shall have been paid in full and all Obligations performed"; and e) should Link fail to make a payment or to perform any act required by the Loan Documents, RFF could make such payment or perform such act "without notice to or demand upon" Link while still recovering from Link "all costs and expenses ... so incurred."

28.   As required by the Loan Agreement, at the closing Link pre-paid (with part of the disbursed loan proceeds) six months of interest due under the Note at the rate of 15% per year, in the total amount of $105,000.  Link also repaid from the loan proceeds the $210,000 advance obtained from RFF in April, 2007 and, in connection with that payment, RFF discharged the mortgage it held on the Property securing the April, 2007 note.

29.   Also at closing, Karll, purportedly acting as the Manager of Desert Pine, signed an agreement subordinating the Desert Pine Mortgage to RFF's mortgage ("the Subordination Agreement").  Karll also signed the Subordination Agreement on behalf of Link, acknowledging receipt of the same.  The Subordination Agreement was not recorded then or later.

30.   The parties did not enter into a subordination agreement with respect to the BD Lending mortgage.

31.   Notably, the Loan Agreement provided for certain

permitted encumbrances, to be listed in the attached Schedules A and B, which were not to subject Link to several of the duties imposed therein.  Both attached Schedules were, however, left blank.

32.  On October 16, 2007, Old Republic Title Insurance Company issued a title insurance policy with respect to the Loan Agreement which provided coverage for RFF as the named insured ("the Title Policy").  The Title Policy provided coverage against rights or claims to the Property not recorded.  It also reflected that the Desert Pine Mortgage had been subordinated but made no reference to the BD Lending Mortgage.

**F.   Default by Link and Extension of Maturity Date**

33.  Link failed to pay the amount due under the Loan Agreement when it became due on March 15, 2008.

34.  In early June, 2008, Karll and Freedman discussed extending the maturity date of the subject loan through a separate loan to a newly-created entity called Saugus Realty Rescue and Development, LLC ("SRR&D") that would be partly owned by RFF and would afford RFF an equity stake in the development of the Property.

35.  Karll and Freedman discussed the proposal with the assistance of an intermediary, Attorney Frank Kirby ("Attorney Kirby"), who was present when Karll and Freedman negotiated the initial advance on the subject loan in April, 2007.  Attorney

Kirby and Freedman had other, prior dealings.

36. By letter dated June 3, 2008, Attorney Kirby sent Freedman an itemized list detailing how the $150,000 "proposed loan" from RFF to SRR&D would be disbursed.   The disbursements were itemized as follows:

| | | |
|---|---|---|
| Lender's Origination Fee (3%) | - | $   4,500 |
| Six (6) Month's Interest at 15% | - | $  11,250 |
| Link Development, LLC Loan Cure | - | $ 105,000 |
| Link Development Default Waiver [SRR&D] | - | $  25,000 |
| RFF Fees and Costs | - | $   4,250 |

37. Also by that letter, Attorney Kirby "authorized" RFF to wire $20,000 of the loan proceeds directly to a bank account of the Law Offices of Frank Kirby as proceeds that would be "returned to the parties who advanced the payment made on behalf of Link in April."   The remainder of the Loan Proceeds were to be disbursed "directly" by RFF "in accordance with the above listing".

38. Freedman's "ledger," by which he tracked incoming and outgoing payments on the subject loan, reflects payments of $5,000 and $15,000 separately received in May, 2008 and a $20,000 "Loan" issued on June 5, 2008.

39. On June 4, 2008, a Citizens Bank account of the Law Offices of Frank D. Kirby received a wire transfer from a bank account of RFF in the amount of $20,000.

### G.    Notice of Default and Events Leading to Foreclosure

40.  Burns & Levinson first began billing RFF for services related to a foreclosure upon the Loan Transaction in November, 2008.  In an entry dated November 10, 2008, a Burns & Levinson attorney reviewed the Loan Agreement, Note, Mortgage and "notice requesting June 4, 2008 note".

41.  By letter dated January 14, 2009, Burns & Levinson, on behalf of RFF, sent Link its first and only written Notice of Default and demanded payment in full of the principal and accrued interest.

42.  The Notice of Default stated that the initial maturity date of the Loan had been extended from April 15, 2008 until November 15, 2008.  Noting that the unpaid balance as of November 15, 2008 was $1,400,000, and applying the penalty interest rate ("the Agreed Rate") from that date forward, the Notice declared that, as of January 15, 2009, Link owed RFF $1,821,472.65.

43.  On or about February 26, 2009, Karll, purportedly acting as the Manager of Desert Pine, assigned the Desert Pine Mortgage on the Property to Russell Associates as security for Link's unpaid legal fees incurred by Russell while attempting to discharge the BD Lending mortgage.

44.  On or about December 28, 2009, Karll, then acting on behalf of Link, signed a Certificate of Attorney's Lien granting Russell a lien on the Property in the amount of $645,364 to

"secure[] a debt for legal services" ("the Attorney's Lien"). "Any transfers of any title in or to" the Property were subjected to the Attorney's Lien, which was recorded on December 29, 2009.

45.  RFF twice postponed the foreclosure sale because Link made payments, totaling $10,000, to postpone it.  Those payments were credited toward the foreclosure expenses of Burns & Levinson.

46.  On March 25, 2010, Russell commenced an action against the Property in Land Court to enforce the Desert Pine Mortgage and the Attorney's Lien that Karll had assigned to Russell.

**H.   RFF's Foreclosure on the Property and its Estimated Value**

47.  On March 26, 2010, RFF exercised its statutory power of sale contained in the Mortgage, conducted a public auction to sell the Property, and foreclosed the Mortgage.  Karll was present at the foreclosure sale.  Attorney MacClary bid at the auction on behalf of RFF.

48.  An appraiser hired by RFF assessed the fair market value of the Property at between $4.85 million and $5.25 million in November, 2009.  That estimate reflected assumptions made about the Property that were not, however, accurate, most notably an assumption that there would be a land swap of adjacent property that would give the Property frontage on a major road.

49.  RFF was the highest bidder at the auction and purchased the Property for $2.5 million.

-12-

50.   In calculating the amount claimed to be due and owing by Link under the Note, Burns & Levinson applied a default interest rate of 32% per year, compounded.  As a result, Attorney MacClary presumed that his $2.5 million bid was only slightly higher than the debt Link then owed under the Loan Transaction.

51.   Although the sale was not consummated, a third-party agreed to purchase the Property in January, 2011, for $3.1 million.

### I.   Costs Incurred Related to the Foreclosure

52.   RFF incurred the following costs in the process of foreclosing: a) $13,618 for advertising fees, b) $7,640 for auctioneer's fees, and c) $85,782 for attorneys' fees.

53.   In October, 2011 RFF reached an agreement with the Town of Saugus to pay back taxes on the Property through the 2011 Tax Year in the amount of $90,222.

## II.   Conclusions of Law

### A.   RFF's Breach of Contract and Indemnification Claims (Counts III and IX)

1.   The Loan Documents constitute a binding, enforceable and integrated contract between RFF and Link (and Karll with respect to the Guaranty only) because: a) both parties were represented by counsel at the time that the papers were signed; b) the Loan Documents include all of the necessary terms of a loan transaction; and c) the Loan Agreement contains an integration clause that was not obtained through fraud, duress or other

-13-

invalidating cause. See <u>RGJ Associates, Inc.</u> v. <u>Stainsafe, Inc.</u>, 338 F. Supp. 2d 215, 243 (D. Mass. 2004) (discussing M.G.L.c. 106, § 2-202).

2.  By executing the Loan Documents, Link agreed to repay the principal and interest accruing on the Loan.  Link breached that obligation by failing to repay that debt by October 15, 2008, and that failure caused RFF to incur costs associated with foreclosing upon the Property.

3.  Because the Loan Documents expressly afforded a 30-day cure period for the borrower's breach of any obligation thereunder but did not require notice to the borrower, RFF was not required to provide Link with notice of its intent to pursue a remedy for any of Link's breaches.

### i.   Failure to Subordinate BD Lending Mortgage

4.  By executing the Loan Documents, Link agreed to provide a valid first mortgage on the Property, to ensure that no lawsuits were pending at the time of the agreement and to subordinate all other liens and indebtedness to that mortgage.

5.  The fact that the Schedules attached to the Loan Documents, which were intended to list encumbrances not subject to the Loan Agreement, were left blank confirms that no encumbrances were exempt. The absence of such a listing is not, on its face, inconsistent with other provisions and, accordingly, the blank Schedules do not create an "ambiguous" term. See <u>Bank</u>

-14-

v. Int'l Bus. Machines Corp., 145 F.3d 420, 424 (1st Cir. 1998) (defining "ambiguity" under Massachusetts law).

6.  Although extrinsic evidence demonstrates that RFF had actual knowledge of the BD Lending Mortgage and related litigation at the time the Loan Documents were executed, that evidence cannot be used to contradict or modify the terms of the Loan Documents under the parol evidence rule because the terms of the contract are unambiguous. See Sound Techniques, Inc. v. Hoffman, 737 N.E.2D 920, 923 (Mass. App. Ct. 2000) (stating Massachusetts parol evidence rule).

7.  Link, therefore, breached its obligations under the Loan Transaction by failing a) to subordinate the BD Lending Mortgage at the time the Loan Documents were signed in October, 2007, and b) to discharge that mortgage when Link settled the State Court Actions against BD Lending in June, 2012.

### ii. Assignment of the Desert Pine Mortgage and Attorney's Lien to Russell Associates

8.  By executing the Loan Documents, Link agreed not to assume additional indebtedness, to create new liens, or to vest ownership without RFF's prior written consent.  Link also agreed to secure subordination of the Desert Pine Mortgage to establish RFF's priority, which Link did on October 15, 2007 when Karll signed the Subordination Agreement on behalf of Desert Pine and acknowledged receipt of the same on behalf of Link.

9.  When Karll, purportedly acting on behalf of Desert Pine,

assigned the Desert Pine Mortgage to Russell Associates as
security for attorneys' fees incurred by Link, he knowingly
caused Link to breach its obligations to subordinate that lien
and not to assume additional indebtedness on the Property.

10.  By granting the Certificate of Attorney's Lien in favor
of Russell, Link again breached its obligation to subordinate
that lien and not to create new liens on the Property.

11.  As a result of the actions of Karll on behalf of Link,
RFF was required to defend its claim to the Property in Land
Court because both liens created a cloud on RFF's title.

12.  Link also breached its obligation to indemnify RFF
against claims upon the Property by failing to reimburse RFF for
costs incurred while defending that Land Court action.

### iii. Failure to Pay Real Estate Taxes

13.  By executing the Loan Documents, Link agreed to pay
Saugus real estate taxes on the Property in a timely manner.  It
failed to do so at all times prior to the March, 2010
foreclosure.

14.  By the terms of the Loan Agreement, Link's obligation
to pay such real estate taxes expressly survived the foreclosure,
which satisfied Link's "Indebtedness" but not all of its
performance "Obligations."

15.  Accordingly, Link's breach of that obligation caused
RFF to pay back taxes on the Property.

**B.   RFF's Claims for Equitable Relief (Counts II, VIII)**

16.   Unlike a claim for breach of contract, a claim for specific performance seeks an equitable remedy that lies within a court's discretion and such a claim should not be granted when the requesting party has engaged in conduct "savored with injustice touching the transaction." Hawthorne's, Inc. v. Warrenton Realty, Inc., 606 N.E.2d 908, 912 (Mass. 1993).

17.   The granting of injunctive relief likewise lies within a court's equitable discretion but is "rarely warranted where no threat of future harm exists." Capability Group, Inc. v. American Exp. Travel Related Services Co., Inc., 658 F.3d 75, 82 (1st Cir. 2011).

18.   In light of a) RFF's actual knowledge of the BD Lending Mortgage when the parties entered into the Loan Transaction and b) RFF's pre-trial settlement of its declaratory judgment claim seeking relief from the BD Lending Mortgage, the Court declines to grant any equitable relief in this case.

**C.   Link's Default and Counterclaim for Surplus (Count IV)**

19.   Although Count IV of Link's Counterclaim alleges wrongful foreclosure, Link also claims a surplus from such foreclosure in that Count.

**i.   The "Agreed Rate"**

20.   By executing the Loan Documents, Link agreed to pay off

the principal of the Note, plus interest at a rate of 15% per annum by March 15, 2008.

21.  By executing the Loan Documents, Link agreed to pay, upon default, the lesser of the default interest rate of 20%

> plus one percent (1%) per month (the 'Agreed Rate'), computed from the date on which the amount was due and payable until paid

or the highest annual rate that may otherwise be lawfully charged.

22.  The contract provision with respect to the "Agreed Rate" indicates that, upon a payment default, interest accrues at 20% during the first month the borrower is in default, 21% during the second month, 22% during the third month, and so on, until the default is paid in full.

23.  Unless explicitly provided otherwise, Massachusetts law presumes the application of simple interest. See Berman v. B.C. Associates, Inc., 219 F.3d 48, 50-51 (1st Cir. 2000) (noting compound interest is disfavored and rates "per annum" apply simple interest rates).

24.  Accordingly, because the Note does not explicitly provide for compound interest, upon default simple interest is deemed to accrue on Link's debt at the "Agreed Rate" of 20% during the first month of default and increasing thereafter pursuant to its terms.

### ii.  Enforceability of the "Agreed Rate"

-18-

25.  The Massachusetts usury law prohibits lenders from charging interest in excess of 20% unless the lender "notifies the attorney general of his intent" to charge a higher rate and "maintains records of any such transaction" describing the name and address of the borrower, the amount borrowed, the interest and expenses to be paid by the borrower, the date the loan is made and the date or dates on which any payment is due. M.G.L.c. 271, § 49(a) & (d).

26.  Parties are permitted to contract for an interest rate higher than 20% so long as the lender complies with the registration and record-keeping requirements M.G.L.c. 271, § 49. Begelfer v. Najarian, 409 N.E.2d 167, 172 (Mass. 1980); see also Levites v. Chipman, 568 N.E.2d 639, 642 (Mass. App. Ct. 1991) (finding loan "immune from attack as usurious" where lender produced letter filed with Attorney General prior to disbursement and records of the transaction were "apparently kept").

27.  RFF satisfied both the registration and record-keeping requirements.  First, it filed two usury notices with the Massachusetts Attorney General's office before Link agreed to the Loan Documents and before the Loan proceeds were disbursed. Second, the Loan Documents themselves contain the statutorily mandated details and RFF recorded payments made on the Loan in Freedman's ledger.

28.  Although Massachusetts law is not settled in this

-19-

regard, <u>see</u> <u>Clean Harbors, Inc.</u> v. <u>John Hancock Life Ins. Co.</u>, 833 N.E.2d 611, 625 (Mass. App. Ct. 2005), this Court concludes that RFF's compliance with the usury statute suffices to permit the enforcement of the terms of the Note. <u>See</u> <u>Cannarozzi</u> v. <u>Fiumara</u>, 371 F.3d 1, 6 (1st Cir. 2004) (stating, albeit in dictum, that satisfaction of M.G.L.c. 271, § 49 "is an absolute defense to the enforceability of the note in question").

### iii. Date of Payment Default

29.  Massachusetts law permits parties to a written, integrated contract to modify that contract orally, provided that there exists evidence "of sufficient force to overcome the presumption" that the integrated and complete agreement, which requires written consent to a modification, expresses the intent of the parties. <u>Wagner And Wagner Auto Sales, Inc.</u> v. <u>Land Rover N. Am., Inc.</u>, 547 F.3d 38, 46 (1st Cir. 2008) (citing <u>Cambridgeport Savs. Bank</u>, 597 N.E.2d at 1022).

30.  Mutual agreement to the modification of a contract, where that contract states that it may be modified only by written instrument, may "be inferred from the conduct of the parties and from the attendant circumstances of the instant case." <u>Cambridgeport Savs. Bank</u>, 597 N.E.2d at 1021.

31.  Although the Note required Link to provide 30 days prior written notice of its intention to extend the maturity date on the Loan from March 15, 2008 to October 15, 2008, and to

prepay the interest owed on the succeeding six months, the
parties orally modified that provision of the Loan document
through their negotiations in June, 2008.

32. The Court concludes that the Note was duly modified as
a result of the following occurrences:

a)   the June 3, 2008 letter from Attorney Kirby itemizing a
     "Loan Cure" that was the amount the Note required Link
     to prepay to extend the maturity date;

b)   payment by RFF of $20,000 to Kirby, pursuant to the
     costs itemized in that letter which was sent to the
     bank account identified therein;

c)   the fact that RFF's law firm, Burns & Levinson, did not
     begin billing for foreclosure costs until November,
     2008 when it sought the "June 2008 Note" and documents
     related to a Notice of Default; and

d)   the January, 2009, Notice of Default which stated that
     Link had extended the maturity date through October,
     2008, and calculated Link's debt based upon November
     15, 2008 as the date of default.

### iv.  Amount of the Surplus

33. Although the parties agreed to extend the maturity
date, Link failed to prove that it prepaid the interest
accumulating between the Initial Maturity Date and the Extended
Maturity Date, i.e. between March 15, 2008 and October 15, 2008.
Accordingly, in addition to the principal outstanding at the time
of Link's default ($1.4 million), Link owes interest accruing at
the regular interest rate until the date of default, the total of
which is $105,000.

34. Link also owes RFF interest that accrued at the Agreed

-21-

Rate between its payment default on October 15, 2008 and the foreclosure sale on March 26, 2010.  Based upon the Court's interpretation of the variable Agreed Rate, i.e. 20% between October 15 and November 15, 2008, 21% between November 15 and December 15, 2008, etc., interest accrued at the rate of 37% for the final 11 days between March 15 and March 26, 2010.  By the Court's calculation, the total interest accrued at the Agreed Rate is $577,266.[2]

35.  RFF, having paid $2.5 million to purchase the Property at foreclosure and being owed a balance of $2,082,266 by Link, holds a surplus in the amount of $417,734 as a result of the foreclosure sale.

### v.   To Whom the Surplus is Owed

36.  Under Massachusetts law, the holder of the equity of redemption does not have a property interest in foreclosure proceeds unless and until all outstanding liens on the property have been extinguished. Perry v. Blum, 629 F.3d 1, 14 (1st Cir. 2010) (internal citations omitted).  A junior lienholder has an equitable lien, transferred from the foreclosed premises, that

---

[2] The Court calculated the daily rate by multiplying the applicable default interest rate by the principal, dividing by 360 days (pursuant to the note) and rounding to the nearest hundredth.  It then multiplied the daily interest rate by the number of days in each month in default (e.g., between October 15 and November 15).  It repeated the process for each month in default.  The total number of days upon which interest accrued, excluding the foreclosure sale date itself, was 527.

attaches to the foreclosure surplus.

37.  Here, there is at least one junior lienholder with a valid claim upon the foreclosure surplus.  Desert Pine, LLC purportedly holds a $2 million mortgage on the Property that was subordinated to RFF's claim at the loan closing.

38.  Accordingly, RFF will hold the surplus in escrow pending a determination of the proper recipients.

**D.   Link's Remaining Counterclaims**

**i.   Breach of Duty to Exercise Good Faith and Reasonable Diligence in Conducting the Foreclosure (Count II)**

39.  A mortgagee is required to conduct a foreclosure sale fairly and in good faith through observance of all procedural requirements under the applicable statutes and the provisions of the mortgage. Seppala & Aho Constr. Co. v. Peterson, 367 N.E.2d 613, 619 (Mass. 1979).

40.  The mortgagee's duty to protect the interests of the mortgagor "is more exacting when [the mortgagee] becomes the buyer of the property" and requires the mortgagee to obtain for the property "as large a price as possible." Williams v. Resolution GGF OY, 630 N.E.2d 581, 584 (Mass. 1994).

41.  Nevertheless, a low price is not, by itself, indicative of a breach of duty by the mortgagee, nor will a court presume bad faith or lack of diligence from the fact that the mortgagee is the only bidder on the property. Pemstein v. Stimpson, 630

N.E.2d 608, 611 (Mass. App. Ct. 1994).

42.  Absent evidence of bad faith or improper conduct, a
mortgagee may purchase the collateral at auction "as cheaply as
it can" and "mere inadequacy of price will not invalidate a sale
unless it is so gross as to indicate bad faith or lack of
reasonable diligence." Resolution Trust Corp. v. Carr, 13 F.3d
425, 430 (1st Cir. 1993) (auction purchase price constituting 56%
of appraisal price did not demonstrate bad faith) (emphasis in
original) (internal quotations and citations omitted); see also
States Res. Corp. v. The Architectural Team,Inc., 433 F.3d 73, 81
(1st Cir. 2005) (difference of 40% between $1,200,000 price paid
at auction and $2 million third-party bid not "so gross" as to
indicate bad faith or a lack of reasonable diligence).

43.  RFF did not breach its duty to exercise good faith and
reasonable diligence in conducting the foreclosure sale because
1) it completed its statutory obligations, i.e. by advertising an
auction and properly conducting the public auction, and 2) it
paid a purchase price that was not so grossly inadequate as to
impute bad faith.  With respect to purchase price, the fair
market value of the Property would have been lower than the 2009
November appraisal because its assumptions were ill-founded and
at the time of foreclosure, the Property was subject to
substantial, albeit junior, liens.

**ii.   Chapter 93A Violation (Count VII)**

44.   Unfair methods of competition and unfair or deceptive practices in the conduct of any trade or commerce, when conducted in the Commonwealth of Massachusetts, are unlawful under M.G.L.c. 93A, § 2.

45.   Unfairness under M.G.L.c. 93A is determined from all the circumstances. <u>Duclersaint</u> v. <u>Fed. Nat. Mortg. Ass'n</u>, 696 N.E.2d 536, 540 (Mass. 1998).  A practice may be deceptive if it reasonably could be found to have caused the plaintiff to act differently than he otherwise would have acted. <u>Id.</u>

46.   A good faith dispute as to whether money is owed, or performance of some kind is due, is not, however, the stuff of which a Chapter 93A claim is made. <u>Id.</u>

47.   Likewise, negligence without more does not constitute an unfair or deceptive practice under Chapter 93A. <u>SMS Fin. V, LLC</u> v. <u>Conti</u>, 865 N.E.2d 1142, 1150 (Mass. App. Ct. 2007) (finding "no basis" for 93A claim where defendant applied erroneous calculation of amount owed at foreclosure due to mistaken reading of forbearance agreement).

48.   RFF's application of a 32% interest rate at foreclosure, compounded, and its failure therefore to recognize that any surplus was owed to Link, resulted from conduct that may have been careless but was not proven to be unfair or deceptive.

49.   In light of the fact that a) the Note provided for a

-25-

penalty interest rate to apply upon default, b) the Agreed Rate increased based upon the number of months that the debtor was in default, starting at 20% annually, and c) at the time of the foreclosure sale in March, 2010, Link had been in default for 16 months, it was not unfair or deceptive for RFF to apply the increasing interest rate at foreclosure.

50.  Persons involved in loan transactions could reasonably and in good faith construe the following clause of the Note, with respect to the applicable interest rate after a default, as calling for compound interest:

> the entire balance of the principal together with all accrued and unpaid interest shall bear interest at the [default rate].

It was not, therefore, unfair or deceptive of RFF to have applied a compound interest rate at foreclosure.

51.  Although the Court concludes that, by an oral modification to the Loan Documents, the parties agreed to extend the maturity date of the Loan, it was not unfair or deceptive to apply the default interest rate beginning in March rather than October, 2008, because Link failed to comply with the written notice and prepayment provisions contained in the Loan Documents.

52.  Although the amount of money owed and the performance due under the Loan Documents was the subject of a legitimate dispute, RFF's attempt to enforce its interpretation of the Loan Documents did not amount to unfair or deceptive practices.

E.    Causation and Damages

53.    Upon proof of breach of contract, the aggrieved party is entitled to damages sufficient in an amount to compensate it for the loss actually sustained and to put it in as good a position financially as it would have been had there had been no breach. Pierce v. Clark, 851 N.E.2d 450, 454 (Mass. App. Ct. 2006) (internal citations omitted).  Damages cannot be recovered when they are "remote, speculative, hypothetical, and not within the realm of reasonable certainty." Id.

54.    Under Massachusetts law, a borrower may be liable for attorneys' fees if the note expressly provides for them but they are limited to an amount that is found to be fair and reasonable. Citizens Bank of Massachusetts v. Travers, 866 N.E.2d 974, 976 (Mass. App. Ct. 2007) (citation omitted).

55.    The Note, among other documents, provides for the collection of the reasonable costs of enforcement and the "reasonable attorney's fees" caused by a payment default or the breach of other obligations delineated in the Loan Agreement.

56.    The fact that a third-party insurer may be obligated to pay a prevailing party's legal fees does not prohibit the prevailing party from recovering legal fees that it actually incurred or permit the losing party to escape liability for legal fees that it agreed to pay.  See N. Associates, Inc. v. Kiley, 787 N.E.2d 1078, 1083 (Mass. App. Ct. 2003) (noting distinction

-27-

between incurring and paying legal fees but finding that
distinction to be "not determinative" of liability for legal
fees); <u>Genuine Parts Co.</u> v. <u>Autopart Int'l, Inc.</u>, No. 200502259,
2010 WL 2764711, at *3 (Mass. Super. May 14, 2010) ("[T]here is
no reason why [defendant] should escape liability for costs and
fees under the covenant simply because a third party covered the
costs of defending [plaintiff]. . .").

57.  The Court concludes that RFF was justified in
foreclosing upon the Property due to Link's payment default.
Under the Loan Documents, RFF is entitled to the reasonable costs
and attorneys' fees associated with foreclosure.  RFF is
therefore entitled to recover those costs which are determined to
be $107,040, less the $10,000 that Link paid to postpone the
foreclosure sale, or a net of $97,040.

58.  The Court concludes that Link's failure to pay real
estate taxes upon the Property prior to foreclosure forced RFF to
pay back taxes that were owed prior to foreclosure.  RFF's
agreement to pay back taxes in the amount of $90,222, however,
included taxes that accrued on the Property after RFF bought it
at the foreclosure sale.  The Court will determine the exact
amount of real estate taxes owed by Link upon further briefing
and/or at a post-judgment hearing.

59.  The Court concludes that Karll's assignment of the
Desert Pine Mortgage and his grant of an attorney's lien in favor

-28-

of Russell Associates forced RFF to defend its title to the Property in the Land Court action initiated by Russell.  RFF is therefore entitled to recover costs from that action totaling $42,031.

60.  The Court concludes that the payment default of Link, its failure to subordinate and discharge the BD Lending Mortgage and its other breaches made it necessary for RFF to bring suit in this Court to recover damages.  The Court will therefore grant reasonable attorneys' fees and costs incurred with respect to this action which fees will be determined upon further briefing and/or at a post-judgment hearing.

61.  RFF has failed to prove that the potential buyer in January, 2011 demurred on the basis that title to the Property was not clear.  Accordingly, RFF's claim for lost profits on that sale is too remote and no such damages will be awarded.

62.  RFF has failed to prove that its decision to settle its claim for declaratory judgment against BD Lending was required by Link's failure to discharge the BD Lending mortgage. Accordingly, RFF is not entitled to recover that settlement amount.

## ORDER

Pursuant to the foregoing Memorandum of Decision, plaintiff, RFF Family Partnership, LP is entitled to judgment against defendants Link Development, LLC and Jeffrey Karll for their breach of obligations under the Loan Documents.  Plaintiff RFF Family

Partnership, LP is, in turn, found, as a result of the foreclosure sale, to be in possession of a surplus in the amount of $417,734 but not to have violated its duties of good faith and reasonable diligence or the provisions of M.G.L.c. 93A, § 2 in the process of foreclosing upon the Property.

**Prior to trial:**

a) Count I of the Complaint was settled and Counts IV and VI of the Complaint and Counts I, III and V of the Counterclaim were withdrawn, and, therefore all of those Counts are **DISMISSED.**

b) Count V of the Complaint seeking a default judgment against defendant Link Development was, at summary judgment, **DISMISSED,**

c) Count VI of defendant Link Development's Counterclaim, alleging misrepresentation, was not argued at trial, is deemed waived and is therefore **DISMISSED.**

**In connection with this Memorandum of Decision:**

a) the motion of defendant Link Development for judgment as a matter of law (Docket No. 158) is **DENIED,**

b) plaintiff's motion to admit additional evidence of the attorneys' fees and expenses incurred by RFF Family Partnership (Docket No. 170) is **ALLOWED;** and

c) the Court retains under advisement defendant's motion to dissolve the preliminary injunction (Docket No. 173) pending a decision on the amount of damages that plaintiff is owed.

**Accordingly, as to the remaining counts of the Complaint and counterclaims:**

1)    judgment is entered for plaintiff, RFF Family Partnership LP, on Counts III and IX of the Complaint,

2)    judgment is entered for defendant, Link Development, on Counts II and VIII of the Complaint,

3)    judgment is entered for counterclaimant, Link Development, on Count IV of the Counterclaim, and

4)    judgment is entered for counterdefendant, RFF Family Partnership, on Counts II and VII of the Counterclaim.

The plaintiff is directed to file, on or before February 20, 2013, a supplemental memorandum, not to exceed ten pages, concerning alleged damages incurred by plaintiff with respect to a) the amount of real estate taxes that accrued upon the Property between the date of the signing of the Loan (October 15, 2007), and the date of plaintiff's foreclosure on the Property (March 26, 2010), and b) plaintiff's alleged reasonable attorneys' fees and costs incurred in this action.  Defendant's opposition, if any, not to exceed ten pages, shall be filed on or before March 6, 2013.

**So ordered.**

                                    /s/ Nathaniel. M. Gorton
                                    Nathaniel M. Gorton
                                    United States District Judge

Dated February 5, 2013

-31-